NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| VICTOR RAFAEL ROSA,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Civil Action No. 12-5176 (JLL)<br><br>OPINION |
|---|---|

**LINARES**, District Judge.

Before the Court is Plaintiff Victor Rafael Rosa ("Plaintiff" or "Claimant")'s appeal seeking review of a final determination by Administrative Law Judge ("ALJ") Donna A. Krappa denying her application for supplemental security income ("SSI"). The Court declines Plaintiff's request for oral argument and, thus, resolves this matter on the Parties' briefs pursuant to Local Civil Rule 9.1(f). For the reasons below, the Court affirms the final decision of the Commissioner of Social Security (the "Commissioner").

I. BACKGROUND

    A. Facts and Procedural History

Plaintiff was born on March 23, 1957, in Santo Domingo, Dominican Republic. R. at 30, 46.[1] He moved to the United States in 1978 and is an American citizen. *Id.* at 30, 34. Plaintiff speaks Spanish. *Id.* at 28, 277. He has a partial elementary school education and is unable to either read or speak English. *Id.* at 30, 277, 280.

---

[1] "R." refers to the pages of the Administrative Record.

Plaintiff has worked sporadically over the years. *Id.* at 30-31, 37. He has worked as a bodega owner, pocketbook distributor, and cleaner. *Id.* He most recently worked as an office cleaner in 2005. *Id.* at 37. He claims that he both gets along with authority figures and can follow written instruction "ok." *Id.* at 162-63.

Plaintiff lives with, and is supported by, his daughter. *Id.* at 30. He helps shop for groceries, pays bills, uses a checkbook, prepares meals for himself, and sometimes cleans their apartment. *Id.* at 33, 160. Plaintiff's daughter takes care of their laundry and does the cleaning that requires more strength. *Id.* at 33. Plaintiff has a driver's license, but alleges that he has not driven in at least one year. *Id.* at 33, 160.

On November 28, 2008, Plaintiff filed an application for SSI with the Social Security Administration ("SSA"). *Id.* at 114-16. The SSA denied Plaintiff's application and subsequent request for reconsideration. *Id.* at 46-47, 54-56. In response, Plaintiff filed a request for a hearing before an ALJ with the Office of Disability Adjudication and Review (the "ODAR"). *Id.* at 62-63.

Said hearing occurred before ALJ Krappa on August 16, 2010, in Newark, New Jersey. *Id.* at 24. Patricia Sasona, an impartial vocational expert, testified at the hearing. *Id.* at 37-42. After reviewing the facts of Plaintiff's case, on September 13, 2010, ALJ Krappa issued a decision finding that Plaintiff was not disabled from November 28, 2008, through the date of decision.[2] *Id.* at 16-23.

Plaintiff sought Appeals Council review. *Id.* at 9. The Appeals Council denied Plaintiff's request on June 22, 2012, rendering the ALJ's decision the final decision of the

---

[2] SSI benefits are not payable for any month prior to the month after the application for such benefits is filed. 20 C.F.R. § 416.335.

2

Commissioner. *Id.* at 1-4. As a result, Plaintiff appealed to this Court on August 16, 2012. Compl. at 1-3. This Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g).

B. <u>Medical Evidence for the Relevant Time Period</u>

Plaintiff claims that he is disabled because of his (1) degenerative disc disease, (2) status post colostomy reversal, (3) sleep apnea, and (4) dysthymic disorder. Plaintiff suggests that these health issues prevent him from walking further than three blocks, standing for longer than fifteen minutes, sitting for more than half an hour, and carrying more than ten pounds. *See* R. at 31-32. A discussion of each of Plaintiff's health issues follows.

1. <u>Degenerative Disc Disease</u>

Plaintiff has had chronic back pain for many years. *Id.* at 328. In March 2009, State consultant orthopedist Dr. Francky Merlin examined Plaintiff. *Id.* at 280-81. Dr. Merlin noted that Plaintiff had a normal station and gait, no difficulty getting up from the seated position, no difficulty getting on and off of the examining table, and unimpaired grasping strength and manipulative functions. *Id.* at 281. Dr. Merlin further noted that Plaintiff was able to flex his spine forward ninety degrees, perform a straight leg raise ninety degrees bilaterally, squat, and walk on his heels and toes. *Id.* In addition, Dr. Merlin noted that Plaintiff had normal responses to light touch, pinprick, and vibration. *Id.* However, Dr. Merlin noted that Plaintiff's neck had tenderness and a reduced range of motion—"left rotation 0-30 degrees, right rotation 0-30 degrees, flexion 0-30 degrees, and extension 0-30 degrees." *Id.* Dr. Merlin diagnosed Plaintiff with joint pain. *Id.*

In August 2009, the Community Medical Center in Toms River, New Jersey x-rayed Plaintiff's cervical and lumbar spines. *Id.* at 331-32. The x-ray of Plaintiff's cervical spine—his neck—revealed no bone injury. *Id.* at 331. However, said x-ray revealed posterior soft tissue

3

calcifications, disc space narrowing in the C5-C6 and C6-C7 discs, and degenerative cervical spondylitic change. *Id.* The x-ray of Plaintiff's lumbar spine revealed no bony injury, fracture, or malalignment. *Id.* at 332. Said x-ray also revealed maintained vertebral body heights, intact posterior elements, and degenerative lumbar spondylitic changes in the L5-S1 disc. *Id.*

In September 2009, Dr. Mohammed Islam, Plaintiff's treating physician, noted that Plaintiff had no deformity or scoliosis in either his thoracic or lumbar spine. *Id.* at 333. Dr. Islam also noted that Plaintiff had a normal full range of motion in all of his joints. *Id.* at 334. Lastly, Dr. Islam noted that Plaintiff had normal sensation, reflexes, coordination, and muscle strength and tone. *Id.* Plaintiff takes Tylenol. *Id.* at 34.

2. <u>Plaintiff's Status Post Colostomy Reversal</u>

On January 17, 2007, doctors at the Raritan Bay Medical Center performed a colostomy on Plaintiff via Hartmann's procedure to treat his perforated diverticulitis. *Id.* at 185, 257-58. Nine months later, on September 10, 2007, Plaintiff again underwent surgery at Raritan Bay Medical Center to reverse his colostomy by end-to-end anastomosis. *Id.* at 184. Despite this history, during Plaintiff's office visits with Dr. Islam in May and August 2009, Plaintiff denied experiencing gas, abdominal pain, abdominal bloating, diarrhea, changes in bowel habits, constipation, dark tarry stools, or bloody stools. *Id.* at 322-23, 328-29. However, Plaintiff testified at the August 16, 2010 hearing that he uses the bathroom about six times a day and occasionally defecates while seated without realizing that he has done so. *Id.* at 35.

3. <u>Sleep Apnea</u>

Plaintiff stated in his January 2009 function report that he suffered from "shortness of breath" and "very sleepless nights." *Id.* at 158. In March 2009, Dr. Merlin noted that Plaintiff's

4

lungs had no wheezing, rales, or ronchi.³ *Id.* at 281. From May to September 2009, Dr. Islam's reports state that Plaintiff's lungs were clear bilaterally to auscultation.⁴ *Id.* at 323, 329, 333. In May 2009, Dr. Islam noted that Plaintiff denied sleep disturbances due to breathing, coughing, shortness of breath, or excessive snoring. *Id.* at 322-23. Nonetheless, at that time, Plaintiff requested a sleep study, and Plaintiff's daughter communicated to Dr. Islam that Plaintiff snored heavily and experienced daytime sleepiness. *Id.* at 322. On September 14, 2009, Dr. Islam diagnosed Plaintiff with mild obstructive sleep apnea. *Id.* at 334. Plaintiff testified at the August 16, 2010 hearing that he has to attach himself to a machine to be able to sleep. *Id.* at 35.

### 4. Dysthymic Disorder

A description of Plaintiff's dysthymic disorder follows. In March 2009, State consultant psychiatrist Dr. Pradip Gupta performed a mental status examination of Plaintiff. *Id.* at 277-79. During said examination, Plaintiff told Dr. Gupta that he had been suffering from depression for the past two years. *Id.* at 277. Plaintiff also indicated that he had never been hospitalized for psychiatric reasons and that he was not taking antidepressants. *Id.* Ultimately, Dr. Gupta diagnosed Plaintiff with dysthymic disorder⁵ and assigned him a Global Assessment of Functioning ("GAF") rating of fifty-five.⁶ *Id.* at 278.

---

³ Rales and ronchi refer to abnormal respiratory sounds. Mosby's Medical, Nursing, & Allied Health Dictionary 444, 1508 (6th ed. 2002) (hereinafter Mosby's Dictionary).
⁴ Auscultation refers to the act of listening for sounds within the body to evaluate the condition of the lungs, typically through a stethoscope. Mosby's Dictionary 161.
⁵ Dysthymic disorder refers to "a disorder of mood in which the essential feature is a chronic disturbance of mood of at least 2 years' duration. It involves either depressed mood or loss of interest or pleasure in all or almost all usual activities and pastimes, and associated symptoms, but not of sufficient severity and duration to meet the criteria of a major depressive episode." Mosby's Dictionary 564.
⁶ The GAF Scale ranges from zero to one-hundred. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) (hereinafter DSM-IV-TR). An individual's "GAF rating is within a particular decile if *either* the symptom severity or the level of functioning falls within the range." *Id.* at 32. "[I]n situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two." *Id.* at 33. "In most instances, ratings on the GAF Scale should be for the current period (*i.e.*, the level of functioning at the time of the evaluation) because ratings of current functioning will generally reflect the need for treatment or care." *Id.* A GAF rating of fifty-one to sixty indicates that an

Dr. Gupta noted that Plaintiff had a decreased and below average general fund of knowledge, and poor abstracts and reasoning. *Id.* Dr. Gupta also noted that Plaintiff had poor insight, the inability to perform serial sevens or threes, and the ability to remember only two out of three objects—an umbrella, an apple, and a hat—after the passage of three minutes. *Id.* Nonetheless, Dr. Gupta noted that Plaintiff could perform simple calculations and exhibited fair remote memory. *Id.* In addition, Dr. Gupta noted that Plaintiff had a flat and constricted affect, and decreased and below average intelligence and judgment. *Id.* However, Dr. Gupta noted that Plaintiff could follow a three step command. *Id.* Furthermore, Dr. Gupta noted that Plaintiff could not drive a car, take public transportation, or do much household cleaning or cooking. *Id.* Lastly, Dr. Gupta noted that Plaintiff most likely could not handle money matters on his own and that he held no signs of psychosis. *Id.* Yet, Dr. Gupta noted that Plaintiff "is independent in daily activities and [activities of daily living "ADL"] independent." *Id.*

At the August 16, 2010 hearing, Plaintiff testified that he was not then taking antidepressants. *Id.* at 34. Plaintiff also testified that he had not attended depression therapy for approximately eight months. *Id.* at 34-35.

## II. LEGAL STANDARD

### A. The Five-Step Process for Evaluating Whether a Claimant Has a Disability

Under the Social Security Act, the SSA is authorized to pay SSI to "disabled" persons. 42 U.S.C. § 1382(a). A person is "disabled" if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A person is unable to engage in

---

individual has "[m]oderate symptoms," *e.g.*, "flat affect and circumstantial speech, [or] occasional panic attacks," or "moderate difficulty in social, occupational, or school functioning . . . ." *Id.* at 34.

6

substantial gainful activity when his physical or mental impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated under the Social Security Act establish a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 416.920(a)(1). At step one, the ALJ assesses whether the claimant is currently performing substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If so, the claimant is not disabled and, thus, the process ends. *Id.* If not, the ALJ proceeds to step two and determines whether the claimant has a "severe" physical or mental impairment or combination of impairments. 20 C.F.R. § 416.920(a)(4)(ii). Absent such impairment, the claimant is not disabled. *Id.* Conversely, if the claimant has such impairment, the ALJ proceeds to step three. *Id.* At step three, the ALJ evaluates whether the claimant's severe impairment either meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(iii). If so, the claimant is disabled. *Id.* Otherwise, the ALJ moves on to step four, which involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity [("RFC")]; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the [RFC] to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000) (citations omitted). The claimant is not disabled if his RFC allows him to perform his past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). However, if the claimant's RFC prevents him from doing so, the ALJ proceeds to the fifth and final step of the process. *Id.*

The claimant bears the burden of proof for steps one, two, and four. *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). Neither side bears the burden of proof for step three "[b]ecause step three involves a conclusive presumption based on the listings . . . ." *Id.* at 263 n. 2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n. 5, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987)). The ALJ bears the burden of proof for the final step. *See id.* at 263. The final step requires the ALJ to "show [that] there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). In doing so, "[t]he ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled." *Id.* (citation omitted). Notably, the ALJ typically seeks the assistance of a vocational expert at this final step. *Id.* (citation omitted).

B. <u>The Standard of Review: "Substantial Evidence"</u>[7]

This Court must affirm an ALJ's decision if it is supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938)). To determine whether an ALJ's decision is supported by substantial evidence, this Court must review the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). However, this Court may not "weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted). Consequently, this

---

[7] Because the regulations governing SSI—20 C.F.R. § 416.920—are identical to those covering disability insurance benefits—20 C.F.R. § 404.1520—this Court will consider case law developed under both regimes. *Rutherford v. Barnhart*, 399 F.3d 546, 551 n. 1 (3d Cir. 2005) (citation omitted).

8

Court may not set an ALJ's decision aside, "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citations omitted).

## III. DISCUSSION

At step one, the ALJ found that Plaintiff "ha[d] not engaged in substantial gainful activity since November 28, 2008, the application date . . . ." R. at 18. At step two, the ALJ found that Plaintiff's degenerative disc disease and status post colostomy reversal were severe impairments. *Id.* The ALJ also found that Plaintiff's dysthymic disorder and mild sleep apnea were not severe impairments. *Id.* At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. *Id.* at 19. At step four, the ALJ found that Plaintiff had the RFC to perform medium work that is simple, unskilled, and repetitive. *Id.* As Plaintiff had no past employment that qualified as "prior relevant work," the ALJ continued to step five. *Id.* at 22. At step five, the ALJ found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. *Id.* Thus, the ALJ concluded that Plaintiff was not disabled. *Id.* at 23. Plaintiff contends that the ALJ erred at steps two, three, four, and five. The Court addresses each of Plaintiff's contentions in turn.

### A. Whether the ALJ Properly Found that Plaintiff's Dysthymic Disorder Was a Non-Severe Impairment at Step Two

Plaintiff contends that the ALJ erred at step two by finding that Plaintiff's dysthymic disorder was not a severe impairment. Pl. Br. at 16. The ALJ supported this finding by noting that Dr. Gupta found in his March 2009 examination of Plaintiff that he: (1) could follow a three-step command; (2) was independent in his ADL; (3) held no signs of psychosis; (4) could perform simple calculations; (5) exhibited fair remote memory; (6) denied undergoing any psychiatric treatment; (7) had never been psychiatrically hospitalized; and (8) was not taking

anti-depressants at that time. R. at 18. In further support of her conclusion, the ALJ referenced some of Plaintiff's responses to the January 2009 function report. *Id.* The ALJ noted that Plaintiff stated in said report that he could drive, pay bills, use a checkbook, get along with authority figures, and follow written instructions. *Id.*

Plaintiff asserts that the above facts referenced by the ALJ in support of her severity finding were inadequate in light of other relevant findings made by Dr. Gupta. Pl. Br. at 16-18. Specifically, Dr. Gupta's seven findings that Plaintiff had: (1) a decreased and below average general fund of knowledge; (2) poor abstracts and reasoning; (3) decreased and below average intelligence and judgment; (4) poor insight; (5) the inability to perform serial sevens or threes; (6) the ability to remember only two out of three objects—an umbrella, an apple, and a hat—after the passage of three minutes; and (7) a flat and constricted affect. Pl. Br. at 16-18; R. at 278. Plaintiff emphasizes that the ALJ also omitted the GAF rating of fifty-five that Dr. Gupta assigned to Plaintiff. Pl. Br. at 18; R. at 278. Likewise, Plaintiff alleges that the ALJ cherry picked from the comment section of Dr. Gupta's evaluation, which states in relevant part:

> The patient came here with a friend who brought the patient here. The patient does not drive a car. The patient cannot take public transportation. The patient cannot do much household cleaning or cooking. The patient is independent in daily activities and ADL independent. The patient most likely cannot handle money matters on his own. . . . The patient is currently not on any medications for depression or anxiety and does not have any insurance at this point.

Pl. Br. at 18-19; R. at 278. The ALJ cherry picked, according to Plaintiff, because she referenced only Dr. Gupta's comment that Plaintiff was "independent in daily activities and ADL independent." Pl. Br. at 18-19. In short, Plaintiff asserts that the ALJ erred at step two by engaging in a selective recitation of the record.

The step-two inquiry into severity "is a *de minimis* screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003) (citations

10

omitted). An impairment is "severe" if the evidence presented by a claimant demonstrates more than a "slight abnormality," having "more than a minimal effect" on the claimant's ability to do "basic work activities." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (citations omitted); *Newell*, 347 F.3d at 546 (citations omitted); SSR 85-28. "Basic work activities" are "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These include:

> (1) "Physical functions;"
> (2) "Capacities for seeing, hearing, and speaking;"
> (3) "Understanding, carrying out, and remembering simple instructions;"
> (4) "Use of judgment;"
> (5) "Responding appropriately to supervision, co-workers and usual work situations;" and
> (6) "Dealing with changes in routine work setting."

*Id.* "The Commissioner's denial at step two, like one made at any other step in the sequential analysis, is to be upheld if supported by substantial evidence on the record as a whole." *McCrea*, 370 F.3d at 361 (citing *Williams*, 970 F.2d at 1182). Consequently, the issue that this Court must now address is whether "no reasonable person could fail to conclude" that Plaintiff's dysthymic disorder was "'severe' under the *de minimis* interpretation of that term currently endorsed by the Commissioner." *Id.* at 362. In doing so, this Court must resolve any reasonable doubts over severity in favor of Plaintiff. *Newell*, 347 F.3d at 547.

The Commissioner argues that the ALJ reasonably found that Plaintiff's dysthymic disorder was not a severe impairment. Def. Br. at 6. The Commissioner asserts that the ALJ was under no obligation to discuss the seven findings from Dr. Gupta's examination highlighted by Plaintiff. *Id.* The Commissioner contends that because these seven findings had no impact on Plaintiff's ability to perform basic work activities, they were irrelevant to the severity determination. *Id.* Not so. For instance, Plaintiff's decreased and below average intelligence

11

and judgment would have "more than a minimal effect" on Plaintiff's "use of judgment," a basic work activity. 20 C.F.R. § 416.921(b)(4); R. at 278. Likewise, Plaintiff's poor insight, abstracts, and reasoning would have "more than a minimal effect" on Plaintiff's "understanding, carrying out, and remembering [of] simple instructions," also a basic work activity. 20 C.F.R. § 416.921(b)(3); R. at 278. Consequently, this Court finds that the ALJ erred in finding that Plaintiff's dysthymic disorder was not severe. Resolving reasonable doubts over severity in favor of Plaintiff, the evidence presented by Plaintiff demonstrated "more than a minimal effect" on his ability to do "basic work activities." *McCrea*, 370 F.3d at 360 (citations omitted); *Newell*, 347 F.3d at 546-47 (citations omitted).

That being said, this Court does not remand this matter on this ground. The Third Circuit has indicated that an ALJ's erroneous finding that some of a claimant's impairments are not severe at step two is harmless if the ALJ finds that the claimant has other severe impairments. *Salles v. Comm'r of Soc. Sec.*, 229 Fed. App'x 140, 145 n. 2 (3d Cir. 2007) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)). Here, the ALJ found that Plaintiff's degenerative disc disease and status post colostomy reversal were severe impairments. R. at 18. Moreover, the Commissioner correctly points out that "although the ALJ found that Plaintiff's mental impairment was not severe, she nonetheless considered it at the remaining steps of the sequential evaluation process . . . ." Def. Br. at 8 (citing R. at 19). The ALJ did so by limiting Plaintiff to "simple, unskilled, and repetitive" work in her decisional RFC. R. at 19. Accordingly, the ALJ's erroneous finding at step two was harmless.

    B.    <u>Whether the ALJ Properly Found That Plaintiff Did Not Have an Impairment or Combination of Impairments That Met or Medically Equaled a Listed Impairment</u>

Plaintiff next contends that the ALJ erred at step three. Plaintiff argues that the ALJ did not properly assess whether each of Plaintiff's severe impairments, or the combination thereof,

met or medically equaled a listed impairment. Pl. Br. at 21-23. An ALJ must "fully develop the record and explain his findings at step three, including an analysis of whether and why [each of claimant's] impairments, or those impairments combined, are or are not equivalent in severity to one of the listed impairments." *Burnett*, 220 F.3d at 120. The Third Circuit has expressed concern that an ALJ might not have satisfied the demands of *Burnett* when he merely stated that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment. Particular consideration was given to Listing 1.00 (musculoskeletal system)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 n.4 (3d Cir. 2001). Similarly, the ALJ here stated in a conclusory fashion:

> The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments .... In making this finding I considered the fact that no treating or examining physician has mentioned findings that are the same or equivalent in severity to the criteria of any listed impairment, nor does the evidence show signs or findings that are the same or equivalent to those of any listed impairment. I paid particular attention to the Listing Sections 1.04 (Disorders of the Spine) and 5.00 (the Digestive System).

R. at 19. In light of this similarity, the ALJ did not satisfy *Burnett*.

This error does not warrant remand, though. In a comparable case, the Third Circuit held that "the ALJ's conclusory statement in step three was harmless." *Rivera v. Comm'r of Soc. Sec.*, 164 Fed. App'x 260, 263 (3d Cir. 2006). The *Rivera* court reasoned that there was "abundant evidence supporting the position taken by the ALJ, and comparatively little contradictory evidence." *Id.* The same can be said here.

The ALJ's decision provided abundant evidence that Plaintiff's degenerative disc disease did not meet or medical equal an impairment listed in Section 1.04.[8] *See* R. at 20-22. The ALJ

---

[8] To meet Listing 1.04, Plaintiff must show that he has a:
  Disorder[] of the spine (*e.g.*, . . . degenerative disc disease . . .), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

13

noted that Dr. Merlin's March 2009 examination found that Plaintiff had a normal station and gait, unimpaired grasping strength and manipulative functions, negative straight leg raising, the ability to squat, and the ability to toe and heel walk. *Id.* The ALJ also noted that Dr. Merlin found that Plaintiff had no sensory, reflex, motor, or muscle strength loss. *Id.* Furthermore, the ALJ noted that Dr. Merlin found that Plaintiff had no difficulty getting up from the seated position, or getting on and off of an examining table. *Id.* The ALJ noted, however, that Dr. Merlin found that Plaintiff's neck had tenderness and a reduced range of motion. *Id.*

The ALJ also referred to the August 2009 x-rays of Plaintiff's cervical and lumbar spines. *Id.* at 20-21. The ALJ noted that the x-ray of Plaintiff's cervical spine revealed posterior soft tissue calcifications, disc space narrowing in the C5-C6 and C6-C7 discs, degenerative cervical spondylitic change, and no fractures. *Id.* at 21. The ALJ also noted that the x-ray of Plaintiff's lumbar spine revealed degenerative lumbar spondylitic changes at the L5-S1 disc. *Id.* at 20-21. However, the ALJ noted that the same x-ray revealed maintained vertebral body heights, intact posterior elements, and no fracture or malalignment. *Id.* Lastly, the ALJ referred to Dr. Islam's September 2009 examination, which stated that Plaintiff had a full range of motion in all of his joints, as well as normal sensation, reflexes, coordination, muscle strength, and muscle tone. *Id.*

Likewise, the ALJ's decision provided abundant evidence that Plaintiff's status post colostomy reversal did not meet or medical equal an impairment listed in Section 5.00. The ALJ

---

A. Evidence of nerve root compression characterized by nuero-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b
20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.04.

stated that "[t]he record reflects no post-operative complication stemming from the claimant's colostomy reversal; indeed, at the time of a physical examination on August 14 2009, by Hobart Medicine the claimant *denied* experiencing gas, abdominal pain, diarrhea, any change in bowel habits, constipation, dark tarry stools, and/or bloody stools . . . ." *Id.* at 20 (emphasis in original). Thus, as the ALJ's error at step three was harmless, the Court does not remand on this ground. *Rivera*, 164 Fed. App'x at 263.

### C. Whether the ALJ's Decisional RFC is Supported by Substantial Evidence

Plaintiff also contends that the ALJ's decisional RFC was not based on substantial evidence.[9] *See* Pl. Br. at 27. RFC is defined as the most that a claimant can still do despite the limitations caused by his impairment(s). 20 C.F.R. § 416.945(a)(1). In this matter, the ALJ determined that Plaintiff had the following RFC:

> The claimant is capable of the exertional demands of medium work as defined under the Social Security Regulations; specifically, he is able to: lift/carry 25 pounds occasionally and 50 pounds frequently; stand/walk for 6 hours in an eight hour work day; sit for 6 hours in an eight hour work day; and perform unlimited pushing and pulling within the weight restriction given. Furthermore, I find that the claimant is able to perform jobs that are simple, unskilled, and repetitive . . . .

R. at 19.

An ALJ must consider all pertinent and probative evidence before her when making her RFC determination. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203-04 (3d Cir. 2008) (citing *Burnett*, 220 F.3d at 121 and *Cotter v. Harris*, 642 F.2d 700, 705-07 (3d Cir. 1981)). Here, as discussed above in Section III. B. of this opinion, the ALJ considered: (1) Dr. Merlin's March 2009 State orthopedic consultative examination; (2) the August 2009 Community

---

[9] Plaintiff speculates that the ALJ based her decisional RFC solely on the vocational expert's response to the ALJ's hypothetical question at the August 16, 2010 hearing: "It is only after the VE answered the ALJ's lone hypothetical with three 'medium' jobs that the ALJ 'decided' that Plaintiff could perform no more than medium work." The Court will not entertain Plaintiff's speculation of the ALJ's motive. Accordingly, the Court instead interprets Plaintiff's speculation as a contention that the ALJ's decisional RFC was not based on substantial evidence.

Medical Center x-rays of Plaintiff's cervical and lumbar spines; and (3) Dr. Islam's treatment records from 2009. R. at 20-21. The ALJ also considered Plaintiff's daily routine, claims concerning his exertional abilities, and dysthymic disorder. *Id.* at 19. Notably, the ALJ found that Plaintiff's alleged functional limitations stemming from her degenerative disc disease were not credible:

> While the record reflects that the claimant had complained of lower back pain for the past few years and while he testified that he has problems with almost all exertional activities. [Sic] his spinal MRI reports and musculoskeletal examinations have revealed little to no abnormalities. Though the claimant has minimal degenerative spinal changes and only a mildly decreased cervical motion, nothing in the record corroborates his alleged extreme functional limitations.

*Id.* at 22. As the ALJ has provided "more than a mere scintilla" of relevant evidence in support of her decisional RFC, this Court finds that her RFC was based on substantial evidence.

### D. Whether the ALJ's Findings at Step Five are Supported by Substantial Evidence

Plaintiff contends that the ALJ did not support her findings at step five with substantial evidence because of two shortcomings. *See* Pl. Br. at 24-36. First, Plaintiff argues that the ALJ's hypothetical question to the vocational expert was not based on substantial evidence. *See id.* at 29. Second, Plaintiff argues that the ALJ improperly decided this case under the grid rules. *Id.* at 29-30. A discussion of each argument follows.

#### 1. Whether the ALJ's Hypothetical Question to the Vocational Expert was Based on Substantial Evidence

Plaintiff contends that the ALJ's hypothetical question to the vocational expert did not encompass three key findings made by State consultant Dr. Jane Shapiro in her psychiatric review of Plaintiff. *See* Pl. Br. at 29. First, Dr. Shapiro's finding that Plaintiff had a depressive

syndrome characterized by anhedonia or pervasive loss of interest in almost all activities,[10] sleep disturbance, psychomotor agitation or retardation,[11] decreased energy, and difficulty concentrating or thinking. R. at 287. Second, Dr. Shapiro's finding that Plaintiff had moderate difficulties in maintaining social functioning. *Id.* at 294. And, third, Dr. Shapiro's finding that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace. *Id.*

An ALJ's hypothetical question to a vocational expert "must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987) (citations omitted). "'[G]reat specificity' is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical." *Ramirez v. Barnhart*, 372 F.3d 546, 554-55 (3d Cir. 2004) (citing *Burns v. Barnhart*, 312 F.3d 113, 122 (3d Cir. 2002). However, there are limits to the required level of specificity. In *McDonald v. Astrue*, the Third Circuit held that an ALJ's hypothetical question limiting a claimant to "simple, routine tasks" adequately reflected Plaintiff's "moderate limitations with [respect to] his ability to maintain concentration, persistence, and pace." 293 Fed. App'x 941, 946-47 (3d Cir. 2008). In holding so, the Third Circuit distinguished that case from *Ramirez*, where it had "held that a hypothetical requiring that the [claimant's] work be limited to 'simple one to two step tasks' was inadequate because it did not take into account that the claimant '*often* suffered from deficiencies in concentration, persistence, or pace.'" *Id.* at 947 n. 10 (quoting *Ramirez*, 372 F.3d at 554 (emphasis in original)).

---

[10] Anhedonia refers to "the inability to feel pleasure or happiness in response to experiences that are ordinarily pleasurable." Mosby's Dictionary 99.

[11] Examples of psychomotor agitation include "the inability to sit still, pacing, hand-wringing; or pulling or rubbing of the skin, clothing, or other objects . . . ." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 163 (5th ed. 2013). Examples of psychomotor retardation include "slowed speech, thinking, and body movements; increased pauses before answering; speech that is decreased in volume, inflection, amount or variety of content, or muteness . . . ." *Id.*

17

Turning to the case before this Court, the ALJ asked the vocational expert to assume a hypothetical individual with Plaintiff's background limited to "simple, unskilled and repetitive" work. R. at 37-38. This limitation is substantively the same as that posed by the ALJ in *McDonald*, which limited the claimant to "simple, routine tasks." 293 Fed. App'x at 946-47. Thus, like the Third Circuit in *McDonald*, this Court holds that the ALJ's hypothetical question adequately reflected Plaintiff's moderate difficulties in maintaining concentration, persistence, or pace.

Still at issue is whether the ALJ's hypothetical question adequately reflected Plaintiff's other limitations—his moderate difficulties in maintaining social functioning and depressive syndrome. *See* Pl. Br. at 29. This Court holds that the ALJ's hypothetical did so. In addition to limiting Plaintiff to "simple, unskilled and repetitive tasks," the ALJ's hypothetical provided for the following limitations: three scheduled breaks of at least fifteen minutes, scheduled at the convenience of the employer; occasional changes in work setting; and occasional contact with the public.[12] R. at 37-38. Limiting Plaintiff to occasional contact with the public sufficiently encompassed his moderate difficulties in maintaining social functioning. Likewise, the ALJ's hypothetical sufficiently encompassed the relevant characteristics stemming from Plaintiff's depressive syndrome—decreased energy and difficulty concentrating or thinking. *See McDonald*, 293 Fed. App'x at 946-47.

---

[12] The ALJ asked the vocational expert the following:

> I'd like you to assume someone of Mr. Rosa's age, educational background and work history. And assume that this person can perform work at all exertional levels. However, the person is limited to jobs that are simple, unskilled and repetitive. Jobs that would permit three scheduled breaks, scheduled at the convenience of the employer during the day; each of at least 15 minute's duration. Jobs that require only an occasional change in work setting during the workday, and only occasional contact with the general public. With those restrictions, would there be any jobs that a person could perform in the regional and national economies?

R. at 37-38.

Relatedly, Plaintiff contends that the ALJ's hypothetical did not adequately reflect Plaintiff's impairments because the ALJ did not tell the vocational expert that Plaintiff did not speak English. Pl. Br. at 30. Plaintiff's contention is unavailing. Although the vocational expert testified over the phone at the August 16, 2010 hearing, she had the opportunity to hear an exchange between the ALJ and Plaintiff. R. at 36-37. Plaintiff testified through an interpreter during this exchange. *See id.* at 26. Thus, the vocational expert was aware of Plaintiff's deficiency in English. Moreover, the ALJ's hypothetical question to the vocational expert instructed her "to assume someone of Mr. Rosa's age, educational background and work history." *Id.* at 37-38. These instructions were sufficiently descriptive to encompass Plaintiff's language barrier given the facts of this case.

Lastly, Plaintiff notes that his exertional impairments—his degenerative disc disease and status post colostomy reversal—yielded no exertional restrictions in the ALJ's hypothetical question to the vocational expert. *See* Pl. Br. at 27. Instead, the ALJ instructed the vocational expert to assume a person that could "work at all exertional levels." R. at 37. As a result, Plaintiff asserts that the ALJ's hypothetical was not based on substantial evidence. *See* Pl. Br. at 27-28. Again, "[a] hypothetical question must reflect all of a claimant's impairments that are *supported* by the record . . . ." *Chrupcala*, 829 F.2d at 1276 (citations omitted) (emphasis added). Here, the ALJ later found in her decision that Plaintiff's alleged functional limitations originating from her degenerative disc disease were not credible. R. at 22. The ALJ also later found in her decision that the record reflected no post-operative complications stemming from Plaintiff's colostomy reversal. *Id.* at 20. As discussed above, in Sections III A and B, the ALJ

19

provided substantial evidence in support of these findings. Accordingly, the ALJ's hypothetical question reflected all of Plaintiff's impairments that were supported by the record.[13]

    2.    <u>Whether the ALJ Improperly Decided This Case Under the Grid Rules</u>

Plaintiff argues that the ALJ improperly decided this case under the grid rules at step five. Pl. Br. at 29-30. The Court need not address this issue. An ALJ's reliance on a vocational expert's response to a properly posed hypothetical question "satisfies the ALJ's burden of establishing there are jobs available which the claimant can perform given her 'severe' disability." *Plummer*, 186 F.3d at 431. Here, the ALJ properly relied on the vocational expert's response to her hypothetical question when the ALJ found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform at step five. R. at 23. Thus, any errors made by Plaintiff in applying Rule 203.18 would not affect the outcome of this case. *Rutherford*, 399 F.3d at 553 (not requiring remand "because it would not affect the outcome of the case.").

## IV. CONCLUSION

The Court has reviewed the entire record and, for the reasons discussed above, finds that the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence. An appropriate order accompanies this opinion.

DATED: September 20, 2013

                                                      JOSE L. LINARES
                                                    U.S. DISTRICT JUDGE

---

[13] Because there was substantial evidence in support of the ALJ's statement that Plaintiff could perform work at all exertional levels in her hypothetical question, the ALJ's subsequent decision to limit Plaintiff to medium work in her decisional RFC, at worst, gave Plaintiff the benefit of the doubt. Thus, this alleged inconsistency does not warrant remand.